## In re FULL HOUSE FOODS, INC., d/b/a Big Apple Diner, Debtor.

### Full House Foods, Inc., d/b/a Big Apple Diner, Plaintiff,

v.

### 33rd Street Enterprises, Inc., Progressive Catering, Inc., Empire State Building Company and Helmsley–Spear Inc., Defendants.

Bankruptcy No. 01–16565 (SMB).
Adversary No. 01–3660.

United States Bankruptcy Court, S.D. New York.

March 4, 2002.

Rattet & Pasternak, LLP, Dawn K. Arnold, James B. Glucksman, of counsel, Harrison, NY, for Plaintiff.

Lazer, Aptheker, Feldman, Rosella & Yedid, P.C., Robin S. Abramowitz, of counsel, Melville, NY, for 33rd Street Enterprises, Inc.

Putney, Twombly, Hall & Hirson, LLP, Geoffrey H. Ward, of counsel, New York City, for Empire State Building.

Douglas J. Pick, P.C., Douglas J. Pick, of counsel, New York City, for Progressive Catering, Inc.

## MEMORANDUM DECISION DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

STUART M. BERNSTEIN, Chief Judge.

This case typifies a secondary but unfortunate consequence of the September 11, 2001 terrorist attack. Full House Foods, Inc., d/b/a Big Apple Diner (the "debtor" or the "plaintiff") operates a coffee shop in the ground floor of the Empire State Building, several miles from Ground Zero. As a result of the terrorist attack, the owner increased Building security, and in the process, restricted (but did not eliminate) public access to the debtor's premises. Contending that it has been partially evicted, the debtor seeks a preliminary injunction abating all rent.

None of the parties are to blame for the situation, and the resolution turns on the consideration of their contracts and arcane rules of landlord-tenant law. For the reasons that follow, I conclude that the debtor's motion for a preliminary injunction abating its rent must be denied.

## BACKGROUND

### A. The Parties' Contracts

The facts underlying the plaintiff's motion are not disputed. The defendant Empire State Building Company ("ESB Company") operates the world famous Empire State Building (the "Building") located in Manhattan. In 1975, it entered into an approximate twenty one year lease (the "Master Lease") with Eripme Enterprises, Ltd. ("Eripme") covering space on the ground floor and concourse level of the Building. (*Debtor's Application for an Order Extending the Debtor's Time in Which to Assume or Reject Its Nonresidential Real Property Lease Pursuant to Section 365(d)(4) of the Bankruptcy Code and Seeking Related Preliminary Injunctive Relief,* dated Jan. 28, 2002 ("*Motion*"), ¶¶ 10, 14.) The premises were to be used and occupied solely for the purpose of operating a first class coffee shop. (*Motion,* Ex. A, ¶ 40.) The parties subsequently modified the Master Lease to substitute certain other space in the Building for some of the original space. (*See Motion* ¶ 15, Ex. B.)

Eripme assigned the Master Lease, as modified, to a third party, and through a series of assignments, the modified Master Lease was eventually assigned to Progressive Catering Services, Inc. ("Progressive") in February 1994. (*See Motion* ¶¶ 16, 25–26.) One year later, ESB Company and Progressive entered into a second modification agreement, dated as of February 15, 1995, extending the original term for an additional fifteen years to December 31, 2011, and fixing the annual rent through that date. (*Id.,* Ex. D.) The Mas-

ter Lease and the two modifications are collectively referred to below simply as the "Master Lease."

At the same time, Progressive entered into a sublease (the "Sublease") with 33rd Street Enterprises, Inc. ("Enterprises") that ran through December 31, 2007. (*Id.*, Ex. L.) [1] The Sublease required Enterprise to pay Progressive the same amount of rent that Progressive owed to ESB Company under the Master Lease. However, it authorized Enterprises to pay the rent directly to ESB Company as agent and attorney-in-fact for Progressive. The Sublease also incorporated all of the terms of the Master Lease. Finally, Enterprises delivered $600,000.00 in promissory notes to Progressive secured by a chattel security agreement. The Sublease characterized the note payments as "additional rent." (*Id.*, ¶¶ 27–28, Ex. L (Rider ¶ 6).)

The debtor entered the scene two years later. On or about August 15, 1997, it executed a series of agreements with Enterprises designed to transfer the coffee shop business. In addition to the sale of the assets, the parties entered into a sub-sublease (the "Sub–Sublease") for the property in question, (*id.*, Ex. P), distinct from the Sublease and the Master Lease. As consideration for the aforementioned agreements, the Debtor (1) made a cash payment to Enterprises, (2) assumed Enterprises' liability under the promissory notes issued to Progressive, and (3) issued its own promissory notes in favor of Enterprises. (*Id.*, ¶ 30.)

The Sub–Sublease tracked many of the provisions of the Sublease. For example,

it required the debtor to pay the rent reserved under the Master Lease directly to ESB Company as agent for Enterprises. It also incorporated all of the terms of the Master Lease and the Sublease, and the debtor agreed to perform the obligations under both agreements. The Sub–Sublease included the debtor's note obligations to Enterprises within the definition of "additional rent," and the incorporation of the Sublease also required the debtor to pay the notes that Enterprises had made in favor of Progressive.[2]

The agreements depict a transaction in which Enterprises would remain as the debtor's landlord until the debtor satisfied the purchase obligation, and then step away. In addition to the Sub–Sublease and security agreement, the debtor and Enterprises executed assignments and assumption agreements relating to the Master Lease and the Sublease, and placed these documents in escrow with Barry P. Fox P.C. If the debtor paid off the promissory notes issued to Enterprises, the escrowed documents would be released, and the debtor would become an assignee of the Master Lease and the Sublease. On the other hand, if the debtor defaulted in the payment of the promissory notes, the assignments and assumption agreements became void, and the other escrowed documents would be returned to Enterprises. (Motion, ¶ 31, Ex. N).

**B. The Events Leading to the Bankruptcy**

Following the closing, the debtor operated the coffee shop. At all relevant times

---

1. The documents provided as part of the Motion do not describe the nature of the transaction between Progressive and Enterprises, but the facts indicate that it involved the sale of the coffee shop business.

2. In addition to the Sub–Sublease, the debtor executed a security agreement granting a security interest in substantially all of the its assets to Enterprises (*see Motion*, Ex. G)(extracts), and a corresponding financing statement. (*Id.*, Ex. F.) The security agreement and Sub-Sublease contained cross-default provisions.

prior to September 11th, the coffee shop had two means of ingress and egress—the Building lobby and the street (33rd Street). The Building was evacuated on September 11th as a result of the terrorist attack, and reopened on September 13, 2001. At that time, ESB Company instituted new security measures and restricted access to the lobby of the Building. As part of these measures, ESB Company told the debtor (and apparently the other ground floor commercial tenants) that it had to close one of the two entrances for security reasons.[3] The debtor opted to close the street entrance, and since September 13th, customers can enter the coffee shop only through the lobby and only after passing through the beefed up security measures at the entrances to the Building. (*Motion* ¶¶ 32–33; *Objection of Empire State Building Company and Helmsley–Spear, Inc. to Debtor's Motion [etc.],* dated Feb. 11, 2002 ("*ESB Objection*") ¶ 13.)

At this point, the debtor stopped paying the rent due under the Sub–Sublease, which included the rent owed to the ESB Company under the Master Lease, and also stopped making the note payments due to Enterprises and Progressive. According to a December 17, 2001 default notice sent by Enterprises, (*Motion* Ex. Q), the debtor owed approximately $68,000.00 under the Master Lease through December 2001, and another approximate $32,000.00, evenly divided between its own notes and the Enterprises notes. Enterprises gave the debtor ten days to cure the defaults, failing which

Enterprises had the right to issue a three day notice canceling the Sub–Sublease.

## C. The Bankruptcy Proceedings

The debtor filed its chapter 11 case on December 28, 2001,[4] and simultaneously commenced this adversary proceeding against the ESB Company, its managing agent HelmsleySpear Inc., Progressive and Enterprises. The debtor seeks (1) a declaratory judgment pursuant to 28 U.S.C. § 2201 determining the nature, validity and status of the interests of Progressive and Enterprises in the estate's property, (2) the subordination of the claims of Progressive and Enterprises, (3) preliminary and permanent injunctive relief abating or reducing the rent due as a result of the actual partial eviction by ESB Company, (4) a determination that the moneys due to Progressive and Enterprises are note payments and not rent, and (5) damages based upon the actual partial eviction of the debtor by ESB Company. The debtor also seeks an order extending its time to assume or reject its nonresidential real property lease pursuant to Section 365(d)(4) of the Code. This opinion addresses the debtor's application for a preliminary injunction, the effect of which would immediately abate all rent.

## DISCUSSION

### A. Introduction

■■■ A party seeking preliminary injunctive relief to maintain the *status quo* must show (1) that he will suffer irreparable harm in the absence of such injunction,

---

**3.** Closing the lobby entrance to the coffee shop prevented visitors from entering the Building through the coffee shop without passing through the lobby security. Closing the street entrance forced all patrons to go through the lobby security before entering the coffee shop.

**4.** The Debtor has not paid any post-petition rent which, according to Enterprises, aggregates approximately $44,000.00 (through February 2002). (*Affidavit [of Robin S. Abramowitz] in Opposition to Debtor's Motion [etc.],* sworn to Feb. 11, 2002 ("*Abramowitz Affidavit*"), at ¶ 17.)

and (2) either (a) he is likely to succeed on the merits, or (b) there are sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tips decidedly in the movant's favor.[5]  *Tom Doherty Assocs. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33 (2d Cir.1995); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 71 (2d Cir.1979).  The *Motion* implies that the debtor will be irreparably harmed without an immediate rent abatement because it does not have enough money to pay its rent obligations, having lost business due to the access restrictions imposed by the ESB Company. (*Motion* ¶ 43.)  At oral argument, however, the debtor conceded for the purpose of its actual eviction argument that the recent security measures have not affected its business.  The concession places the debtor in the same position as any other debtor who does not have enough money to pay its obligees through no fault of the latter.  The debtor is using the business premises to conduct business and earn income, and cannot avoid paying its administrative debt on the grounds that it is detrimental to its business.

Even if the debtor had demonstrated irreparable harm, it nonetheless failed to satisfy the second prong of the test.  The debtor's argument on the merits comes down to two points.  First, it claims a breach of the Master Lease that resulted when the ESB Company forced the debtor to close the street entrance.[6]  Second, the debtor maintains that ESB Company's interference with ingress and egress to the coffee shop gives it the common law right to abate rent.

## B.  The Contract Claim

Although the *Motion* largely ignores the Sub–Sublease and directs most of its arguments at the ESB Company, Enterprises is the debtor's landlord.[7]  The Sub–Sublease is the only effective document that permits the debtor to occupy and use the premises.  The Master Lease and Sublease are presently held in escrow, and will not be delivered until the debtor satisfies all of its obligations to Enterprises.  Accordingly, the debtor is the tenant of Enterprises and the subtenant of the ESB Company.  It is not in privity of contract or privity of estate with the ESB Company, *see* MILTON R. FRIEDMAN, FRIEDMAN ON LEASES § 7.701 (4th ed.1997)("FRIEDMAN"), and has no claims against its overlandlord for breach of any of the lease agreements.  *See id.; Wright v. Catcendix Corp.*, 248 A.D.2d 186,

---

5.  A movant must show a greater likelihood of success if he seeks injunctive relief that either changes the *status quo* or provides the movant with substantially all of the relief sought which cannot be undone if the defendant ultimately prevails.  *Tom Doherty Assocs. v. Saban Entertainment, Inc.*, 60 F.3d at 33–34. The debtor is arguably seeking a mandatory injunction since it is seeking immediate relief from its contractual obligations as well as the duties imposed under 11 U.S.C. § 365(d)(3). In addition, in light of the debtor's financial condition, the party entitled to rent may never get it if it does not collect it now.  The defendants, however, have not argued for the higher standard, and hence, the ordinary preliminary injunction standard will apply.

6.  Although the ESB Company allowed the debtor to "choose" which entrance to close, and the *Motion* does not say what would have happened if the debtor refused, I will assume that the ESB Company would have resorted to self-help, and closed one of the entrances if the debtor had not made the designation. Hence, I will treat the closing as one accomplished through the ESB Company's acts for the purposes of this opinion.

7.  The terms of the Sub–Sublease confirm the parties' relationship. The first paragraph to the Rider states that "the Landlord herein [Enterprises] is not the owner of the fee of the demised premises...."

670 N.Y.S.2d 15, 16 (N.Y.App.Div.1998). Any lease-based claims lie solely against Enterprises, the only party with whom the debtor has a contractual relationship.

The Master Lease and Sublease are nonetheless relevant to a determination of the rights between the debtor and Enterprises since the Sub-Sublease incorporates their terms. The debtor's lease-based claims against Enterprises suffer from at least two defects. First, the debtor has failed to identify a contractual right to two entrances. None of the operative documents grants the debtor such an express interest or right. Instead, the debtor points to §§ 40 and 41 of the Master Lease, contending that they require the ESB Company to provide unfettered access through the Building lobby and the street. Section 40 states, in relevant part:

> [T]he demised premises shall be used and occupied by Tenant solely as a first class coffee shop to be constructed substantially similar to Whitney's at 325 Madison Avenue and 40 West 57th Street and the Hickory House at 475 Park Avenue South....

Further, § 41 reads:

> Tenant ... covenants and agrees that at all times ... (b) the business to be conducted at, through and from the demised premises will be of first class quality and reputable in every respect....

Citing § 40, the debtor argues that both Whitney's and Hickory House enjoyed lobby and street access, and implies that the clause grants the same right to the debtor. (*Motion* ¶ 21.) Section 41, the debtor contends, indicates an intent that transit through the premises, and the combination of street and lobby access, were material to the existence and success of the coffee shop. (*Id.* ¶¶ 23–24.)

The debtor's construction is unreasonable as a matter of law, and cannot create an ambiguity. *See Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992). Sections 40 and 41 refer to obligations of the tenant, not the landlord, under the Master Lease. Both refer to the quality of the business that the tenant must provide, and not surprisingly, neither discusses rights of access. Hence, §§ 40 and 41 of the Master Lease do not provide contractual support for the debtor's position.

Even if the Master Lease granted a right to or interest in two entrances, the Sub–Sublease contains a broad exculpatory clause that would appear to exonerate Enterprises from any potential liability under the circumstances. The Rider to the Sub–Sublease states:

> It is expressly agreed that the Landlord [Enterprises] is not obliged to provide or render any services whatsoever to the Tenant [the debtor] and the Landlord shall not be liable for monetary damages, or otherwise, in the event ... that the Tenant suffers any damages as a result of any act committed or omitted to be done by the Overlandlord [the ESB Company]; and the Landlord herein does not warrant that the Tenant will have peaceful possession of the demised premises during the term hereof.

(*Abramowitz Affidavit* Ex. A., Rider, pp. 1–2.)

The debtor has not attributed any wrongful act to Enterprises; it claims that the ESB Company improperly closed off the street entrance. The exculpatory clause insulates Enterprises from liability for any acts of the ESB Company, and moreover, Enterprises does not even warrant peaceful possession. Accordingly, the debtor has failed to demonstrate the existence of a viable damage claim against Enterprises.

## C. The Common Law Claim

In addition to its contract claim, the debtor asserts that it is entitled to a total abatement of rent based upon the doctrine of partial, actual eviction. An actual eviction occurs, whether partial or complete, when the tenant is wrongfully expelled or excluded from physical possession of the leased premises. *Barash v. Pennsylvania Terminal Real Estate Corp.*, 26 N.Y.2d 77, 308 N.Y.S.2d 649, 256 N.E.2d 707, 709 (1970); *see* 2 ROBERT F. DOLAN, RASCH'S LANDLORD AND TENANT § 28:2, at 324 (4th ed.1998)("DOLAN"). The actual eviction by the landlord, even if partial, abates all rent. The rationale is that the landlord cannot apportion his own wrong by continuing to collect the rent allocable to the unaffected part of the leasehold estate. *See Barash v. Pennsylvania Terminal Real Estate Corp.*, 308 N.Y.S.2d 649, 256 N.E.2d at 710; *Fifth Ave. Bldg. Co. v. Kernochan*, 221 N.Y. 370, 117 N.E. 579, 580 (1917)(Cardozo, J.).

A different rule applies where the landlord's landlord commits the act of eviction. As noted above, the subtenant and overlandlord are not in privity of contract or privity of estate; the sublessor stands as a "buffer" between the two. FRIEDMAN § 7.701. If the overlandlord commits a wrongful act of eviction, his actions constitute an eviction of his own tenant (the sublessor), *O'Connell v. Sugar Products Co.*, 114 Misc. 540, 187 N.Y.S. 98, 100 (N.Y.App.T.1921); 2 DOLAN § 28:19, at 338; but it is not an eviction of the subtenant, and does not give the subtenant a defense against his duty to pay the rent. FRIEDMAN § 7.701.

*Jones & Brindisi, Inc. v. Bernstein*, 119 Misc. 697, 197 N.Y.S. 263 (N.Y.App.T. 1922), a case factually similar to the one before me, illustrates these principles. The premises at issue required access to a hallway. The overlandlord blocked access to the subtenant, the subtenant stopped paying rent to the sublessor, and the sublessor sued the subtenant for rent.

The court assumed that the overlandlord's action was wrongful, and that hallway access was essential to the occupancy. *Id.* at 264. Further, the court opined that if the landlord had blocked its own tenant from access to the hallway, it would probably constitute an eviction. *Id.* The court nonetheless concluded that the overlandlord's wrongful act did not allow the subtenant to claim an eviction:

> It is unnecessary, however, to pass upon the sort of conduct of a lessor that would entitle his immediate lessee to vacate, as the rule that relates to the interference with a lessee by his lessor has no applicability to the case of an interference with an undertenant by his lessor's lessor. The undertenant has no option to go out because of any unlawful conduct, no matter what, on the part of his lessor's lessor, for in the law, as to him, his lessor's lessor is a mere trespasser, with no different character from that of any other stranger.

*Id.* at 264–65.

Assuming that closing the 33rd Street entrance amounted to a wrongful act of partial eviction by the ESB Company, the eviction claim belongs to Enterprises, while at most, a trespass claim belongs to the debtor. The law views the ESB Company no differently than any other stranger. If a stranger had sealed off the street entrance, the debtor would still have to pay rent to Enterprises, although it could sue the stranger. There is no evidence that Enterprises participated in the wrongful act, and consequently, no ba-

sis to deny rent to Enterprises.[8] In short, the debtor may have claims against the ESB Company, but it cannot offset those claims against its rent obligations to Enterprises.

Accordingly, the plaintiff has failed to show either a likelihood of success on the merits, or a serious question going to the merits, of its rent abatement claim (or any other claims against Enterprises), and accordingly, it has failed to show a right to preliminary injunctive relief.

## D. The Note Payments

Finally, the debtor argues that it should not be required to pay the notes it executed in favor of Enterprises or the notes that Enterprises issued to Progressive. Without dispute, these obligations are due and payable as "rent," either expressly under the Sub–Sublease or through the latter's incorporation of the Sublease. The debtor nevertheless contends that the Sub–Sublease is not a true lease, and the note payments are partially or completely unsecured.

For the reasons discussed above, the Sub–Sublease is a true lease. Section 365(d)(3) commands the debtor, with certain exceptions that are not relevant, to perform its commercial lease obligations in a timely fashion until the lease has been assumed or rejected. The statute does not distinguish between rent and other lease obligations, or secured or unsecured claims. The debtor has not argued that even if the note payments are obligations under the Sub–Sublease, § 365(d)(3) does

not apply to them. Hence, § 365(d)(3) requires the debtor to pay the notes.

Settle order on notice.

---

8.  A tenant is entitled to a partial abatement of rent if he suffers an actual, partial eviction through the act of a stranger with paramount title. *Fifth Ave. Bldg. Co. v. Kernochan*, 117 N.E. at 580. Such an eviction arises where a stranger establishes superior title and an immediate right to possession, and as a result, gains possession. 2 DOLAN § 28:50, at 360. Although the ESB Company has a reversionary interest in the leasehold premises, it did not have a right to immediate possession when it closed the street entrance.