In re John B. FAYOLLE and Riverbank Landscape, Ltd. and Aristocratic Coach Corp., Debtors.

Authentic Hansom Cabs, Ltd., Plaintiff,

v.

Alan Nisselson, Trustee for the Chapter 11 Estate of John Fayolle and Riverbank Landscape, Ltd., Frank Sinatra, Trustee for the Chapter 11 Estate of Aristocratic Coach Corp., Anchor Paper Stock Co., Inc., and 504 West 38 LLC, Defendants.

Bankruptcy Nos. 00 B 41291 (RDD) to 00 B 41293(RDD).
Adversary No. 02–03115.

United States Bankruptcy Court,
S.D. New York.

Sept. 2, 2003.

Cohen, Tauber, Spievack & Wagner, LLP, by Ira R. Abel, New York City, for Authentic Hansom Cabs, Ltd.

Kramer, Levin, Naftalis & Frankel, LLP, by Jack Hazan, New York City, for 504 West 38 LLC.

Brauner, Baron, Rosenzweig & Klein, LLP, by Leslie S. Barr, New York City, for Alan Nisselson, Chapter 11 Trustee of John Fayolle and Riverbank Landscape, Ltd.

Holland & Knight, LLP, by Peter Alan Zissler, New York City, for Frank Sinatra, Chapter 11 Trustee of Aristocratic Coach Corp.

Margolis Bergson, LLP, by Robert J. Bergson, New York City, for Anchor Paper Stock Co.

### MEMORANDUM DECISION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

ROBERT D. DRAIN, Bankruptcy Judge.

Each party in this adversary proceeding seeks a declaratory judgment with respect to the status of a sublease (the "Sublease") dated December 19, 2001 between Alan Nisselson (the "Fayolle Trustee"), in his capacity as chapter 11 trustee of John Fayolle ("Fayolle"), as sublessor, and Au-

thentic Hansom Cabs, Ltd. ("Authentic"), as sublessee. The Sublease pertains to a building located at 504–506 West 38th Street in New York City (the "Building"). Defendant Anchor Paper Stock Co. ("Anchor") is the landlord under the main lease of the Building pursuant to a Standard Form of Loft Lease and Rider, each dated as of November 1, 1997 (the "Overlease"), with Fayolle as tenant. Pursuant to an order of the Court (Hon. Richard Bohanon, J.) dated November 22, 2002, the Fayolle Trustee assumed and assigned the Overlease to 504 West 38 LLC. Under the November 22, 2002 order, the assignment to 504 West 38 LLC was free and clear of all encumbrances but expressly was subject to the rights, if any, of Authentic as determined in this adversary proceeding.

Authentic takes the position that the Sublease remains in effect. The Fayolle Trustee and the other defendants contend, instead, that the Fayolle Trustee validly terminated the Sublease for, among other things, Authentic's non-payment of rent.

Relatedly, but separately, Authentic seeks a declaration that it has the right to offset or recoup its obligations under the Sublease against obligations owing to Authentic, specifically $100,000 that Authentic contends it is owed under a settlement agreement dated as of December 19, 2001 (the "Hudson Settlement Agreement"), between, among others, Authentic, on the one hand, and the Fayolle Trustee and Frank Sinatra (the "Aristocratic Trustee;" with the Fayolle Trustee, the "Trustees"), as chapter 11 trustee of Aristocratic Coach Corp. ("Aristocratic"), on the other. Authentic argues that such setoff or recoupment would satisfy its obligations under the Sublease or, at least, render the Fayolle Trustee's termination of the Sublease defective and invalid. (Alternatively, Authentic seeks an injunction directing that the $100,000 be paid to it if it does not

have a valid right of setoff or recoupment against its Sublease obligations.) Authentic also argues that Anchor's refusal to consent to Authentic's proposed alterations of the Building excuses Authentic's default under the Sublease.

The Trustees and the other defendants deny that Authentic has any right of setoff or recoupment against its obligations under the Sublease, and, in any event, that the conditions under which Authentic would have been entitled to the $100,000 under the Hudson Settlement Agreement have failed. The defendants also contend that Anchor had the right to refuse to consent to the proposed alterations to the Building and, in any event, that Anchor's wrongful withholding of consent would not excuse Authentic's failure to perform its obligations under the Sublease.

Each side seeks summary judgment—the defendants, who have not made a formal motion for summary judgment, on the basis that "In considering a motion for summary judgment, if the Court's analysis reveals that there are no genuine issues of material fact, but that the law is on the side of the nonmovant, the Court may grant summary judgment in favor of the nonmovant even in the absence of a cross-motion … so long as the movant has had an adequate opportunity to come forward with all of its evidence." *Jacques v. DiMarzio, Inc.*, 200 F.Supp.2d 151, 162 (E.D.N.Y.2002); *see also Orix Credit Alliance, Inc. v. Horten*, 965 F.Supp. 481, 484 (S.D.N.Y.1997); 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720 (2d ed.1983).

There are no material issues of disputed fact, as this is fundamentally a documentary dispute. Because Authentic's position is not supported by the relevant documents or applicable law, Authentic's motion for summary judgment is denied.

Defendants' arguments being the reverse image of Authentic's arguments, defendants' request for summary judgment is appropriate and is granted. The Trustees do not owe Authentic any money under the Settlement Agreement, the conditions for such payment having failed. Thus, whether Authentic has a right of setoff or recoupment in respect of the Sublease is moot. Anchor's refusal to consent to the proposed modifications to the Building, whether or not valid, does not excuse Authentic's defaults under the Sublease. Nor has Authentic offered any other valid reason for contesting the Fayolle Trustee's termination of the Sublease.

### Facts

The facts are found, unless otherwise noted, in Authentic's statement pursuant to Local Bankruptcy Rule 7056–1(a) and the documents referred to therein, which are attached as exhibits to Fayolle's affidavits dated March 4, 2003 ("Fayolle Affidavit 1"), and June 23, 2003. Defendants' responsive statement pursuant to Local Bankruptcy Rule 7056–1(b) does not dispute the facts set forth in Authentic's Rule 7056–1(b) statement but, rather, disagrees with Authentic's characterization of certain of those facts.

On May 15, 2000, involuntary chapter 7 petitions were filed against Fayolle and two entities controlled by him—Riverbank Landscape, Inc. ("Riverbank") and Aristocratic. The debtors voluntarily converted their cases to chapter 11, but Judge Bohanon subsequently appointed the Trustees.[1] The Trustees decided to market the debtors' assets jointly. Those assets primarily consisted of the Overlease and real property owned by Aristocratic at 634 West 52nd Street, New York City (the "Aristocratic Premises"), which was used as a livery stable for hansom cab horses, and real property owned by Riverbank at 639–41 West 51st Street (the "Riverbank Premises"), which was a defunct "adult entertainment facility." The Riverbank Premises and the Aristocratic Premises are adjacent to each other on the Hudson River waterfront and are referred to together as the "Blockfront Properties."

In December, 2001 the Trustees entered into an agreement to sell the Blockfront Properties and the Overlease with stalking horse bidders, subject to higher and better offers to be received at an auction scheduled for January 25, 2002.

Two non-debtor entities controlled by Fayolle—Authentic and Hudson River Lounge, LLC ("Hudson")—asserted leasehold interests in the Aristocratic Premises and the Riverbank Premises. To facilitate the marketing of the Blockfront Properties, which were more attractive to prospective purchasers if Authentic and Hudson did not have the right to hold over as tenants under section 365(h) of the Bankruptcy Code, the Trustees negotiated the Hudson Settlement Agreement with Fayolle, Hudson and Authentic at the same time that they were negotiating with the stalking horse bidders.

Under the Hudson Settlement Agreement, Authentic agreed to terminate its lease of the Aristocratic Premises and Hudson agreed to terminate its lease of the Riverbank Premises, each waiving their right to hold over under section 365(h). In return, the Fayolle Trustee agreed to sublease the Building to Authentic, and the Trustees agreed to make two payments to Authentic, one of $75,000 and one of $25,000, under certain specified conditions. In the Hudson Settlement Agreement, Authentic also agreed to satisfy an overdue $20,000 rent obligation under its lease of the Aristocratic Premises by ap-

---

**1.** The Fayolle Trustee also was appointed chapter 11 trustee of Riverbank.

plying such amount in three installments to amounts owing under the Overlease. It was understood that Authentic intended to try to develop and operate the Building as a livery stable to replace the Aristocratic Premises that it was agreeing to vacate under the Hudson Settlement Agreement.[2]

Pacific Circle, Inc. ("Pacific Circle") was the winning bidder at the January 25, 2002 auction. By order dated February 5, 2002 (the "February 5 Order"), Judge Bohanon approved the Trustees' proposed sale to Pacific Circle, including the assignment of the Overlease, as well as approved the Settlement Agreement and the Fayolle Trustee's entry into the Sublease. The term of the Sublease commenced sixty days after receipt of Court approval, or April 6, 2002, which one can infer from the Hudson Settlement Agreement was roughly the time believed to be required for Authentic to move the livery operation out of the Aristocratic Premises and into the Building in anticipation of the closing of the Pacific Circle transaction. The effectiveness of the Sublease was not conditioned, however, upon the closing of the Pacific Circle transaction. Nor was the effectiveness of the Hudson Settlement Agreement, although, as discussed in more detail below, Authentic's right to the $100,000 *was* tied to the closing of the proposed sale transaction.

Paragraph K(v) of the February 5 Order recited the amount outstanding under the Overlease as of January 31, 2002—$124,553.57—and required this sum, together with any additional amounts accrued through the date of the closing, to be paid as cure under section 365(b) of the Bankruptcy Code upon the assumption and as-signment of the Overlease to Pacific Circle. The February 5 Order also confirmed Anchor's consent to the Sublease, provided that it was paid an additional $57,000 security deposit.

Notwithstanding the foregoing, however, Authentic never occupied the Building under the Sublease, although Authentic contends that for some period it had access to the premises. Authentic also has not received any of the $100,000 of conditional payments set forth in the Settlement Agreement. Nor has Authentic paid any portion of the rent provided under the Sublease or the $20,000 under the Hudson Settlement Agreement. It also has not paid the $57,000 security deposit referred to in the February 5 Order. Fayolle Affidavit 1 ¶ 56.

The context of the foregoing becomes somewhat clearer when it is understood that Pacific Circle did not close the sale approved in the February 5 Order, although Pacific Circle's failure to close does not explain why Authentic failed to make its rental payments under the Sublease and the Hudson Settlement Agreement.

It was not immediately apparent that Pacific Circle was not going to close. Instead, there was a lengthy limbo period during which the parties postponed the closing in the hope that Pacific Circle could complete its financing and simultaneously considered fallback alternatives. At one point, Pacific Circle increased its security deposit from $400,000 to $500,000 to obtain a little more time. During this period, Pacific Circle also corresponded with Anchor about Authentic's proposed alterations to the Building. In anticipation of a closing "within the next few weeks," on

---

**2.** Neither Authentic nor any other Fayolle-controlled entity owns the hansom cab horses stabled in the Aristocratic Premises. Either Aristocratic or another Fayolle-controlled entity has some relationship with the owners of the hansom cab horses stabled in the Aristocratic Premises, but the nature of that relationship is unclear and irrelevant to the present motions.

May 14, 2002 Pacific Circle's counsel requested Anchor's approval of Authentic's preliminary alteration plans. Anchor's counsel responded to this request in a letter dated May 30, 2002 in which he described Anchor's reasons for withholding its consent to the proposed alterations, Anchor's primary concerns being that the plans contemplated material structural changes to the Building (which Anchor asserts required Anchor's consent under Article 3 of the Overlease) and that Authentic would have to provide additional information before Anchor could evaluate fire, odor, environmental and construction-related issues.[3] At about the same time, Anchor's counsel informed counsel for the Fayolle Trustee of a revised cure amount under section 365 of the Bankruptcy Code assuming a June 4, 2002 closing—$182,-517.47—the $57,963.90 increase from the cure amount stated in the February 5 Order primarily comprising unpaid rent from February through June, 2002.

During the period that the closing of the Pacific Circle transaction was postponed, rent obviously continued to accrue under the Overlease, which presented a problem for the Trustees since Authentic was not making the rent payments required by the Sublease and the Hudson Settlement Agreement. On March 20, 2002, counsel for the Aristocratic Trustee notified counsel for Fayolle and Authentic that Authentic had defaulted on its obligation under the Hudson Settlement Agreement to pay $20,000 of back rent on the Overlease. By letter dated April 22, 2002, the Fayolle Trustee informed Fayolle that, "given the lack of progress to close the [Pacific Circle] transactions," he was not prepared to permit Fayolle (who had no contractual privity with the Fayolle Trustee, Authentic being the subtenant) to continue to utilize

the Building rent-free and was changing the locks.

Then, by letter dated July 25, 2002 (the "Termination Letter"), counsel for the Fayolle Trustee notified Authentic that "by reason of Sublessee's defaults under the captioned Sublease, including without limitation under Paragraph 5 of the Sublease, [the Fayolle Trustee] has elected to terminate the Sublease, effective as of 11:59 p.m., July 31, 2002." Separate and apart from the Fayolle Trustee's cure obligations in respect of the Overlease, unpaid rent under the Sublease for the period from April 6, 2002 through July 31, 2002 was at least $48,387.68. Fayolle Affidavit 1 ¶ 71.

The parties dispute when Authentic received the Termination Letter, but they agree that Authentic's counsel received it no later than August 9, 2002. In a letter dated August 14, 2002, Authentic's counsel responded to the Termination Letter by refusing to accept the termination of the Sublease, for basically the same reasons that Authentic has raised in this adversary proceeding, and noted that the parties had "agreed to disagree for the moment without prejudice to either side." In response to the Termination Letter, Authentic did not propose to make any payment in respect of rent under the Sublease, or the $20,000 under the Hudson Settlement Agreement, or the security deposit, all of which remained unpaid.

Roughly at the same time, on August 5, 2002 Anchor filed a motion for relief from the automatic stay under section 362 of the Bankruptcy Code to terminate the Overlease for nonpayment of rent.

At a hearing on August 28, 2002, Judge Bohanon issued a bench ruling denying Anchor's motion to terminate the Overlease, on the condition, however, that the

---

**3.** Thereafter, Anchor has consistently withheld its consent to the alterations to the

Building proposed by Authentic or its designee.

Fayolle Trustee promptly cure the outstanding payment defaults under the Overlease.[4] At the hearing, the Fayolle Trustee proposed to pay the cure amount with a portion of the $500,000 security deposit that Pacific Circle had forfeited upon its failure to close, the parties by that time having accepted that the Pacific Circle transaction was not going to happen. Judge Bohanon found this acceptable.

Authentic's counsel actively opposed Anchor's lift-stay motion at the August 28, 2002 hearing, fully supporting the Fayolle Trustee's payment of the arrearages under the Overlease. Oddly, no party informed Judge Bohanon that the Fayolle Trustee had delivered the Termination Letter weeks before the August 28, 2002 hearing. No party has suggested, however, that the Fayolle Trustee ever rescinded or expressly waived the Termination Letter—as opposed to Authentic's assertion that the Fayolle Trustee implicitly waived termination by not immediately enforcing his rights after receipt of Authentic's response to the Termination Letter and instead "permitted" Authentic to pursue this litigation—and no such waiver appears in the record.

On August 29, 2002, the roof of the Building partially collapsed, and there is no dispute that since August 29, 2002 Authentic has not been in physical possession of the Building.

One of the Fayolle Trustee's arguments for denying Anchor's lift-stay motion was that the Trustees were about to seek Court approval of a new auction sale process for the Blockfront Properties and the Overlease, now that the back-up bidder who had been approved by the February 5 Order also had failed to close. Having obtained Court approval to do so, on September 18, 2002 the Trustees held another auction of the Blockfront Properties, although the Fayolle Trustee had decided by then to remove the Overlease from the assets to be auctioned that day. By order dated September 20, 2002 the Court approved the highest bidder at this second auction of the Blockfront Properties, and that high bidder has since closed the transaction. The sale price resulting from the September 18, 2002 auction was substantially less than the price under the original, January 25, 2002 auction, however.

Authentic commenced this adversary proceeding on September 18, 2002. The Fayolle Trustee continued to market the Overlease, and by order dated November 22, 2002, Judge Bohanon approved the sale of the Fayolle Trustee's interest in the Overlease to 504 West 38 LLC, subject, as noted above, to Authentic's rights, if any, asserted in this proceeding. The actual cure amount under section 365(b)(1)(A) of the Bankruptcy Code upon the Fayolle Trustee's assumption and assignment of the Overlease to 504 West 38 LLC was $265,000, which the Fayolle Trustee has paid. Affidavit of Alan Nisselson, dated May 7, 2003, ¶ 15. (Apparently Anchor waited until after the closing of the assignment to 504 West 38 LLC to take its cure payment, notwithstanding Judge Bohanon's August 28, 2002 bench ruling.)

*Jurisdiction*

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (M) and (O) and a controversy appropriate for declaratory

---

4.  Judge Bohanon determined that because the Pacific Circle transaction had not closed, the Fayolle Trustee had never assumed the Overlease; therefore, the Court's reference to "cure" in the August 28, 2002 bench ruling was not for purposes of section 365(b)(1)(A) of the Bankruptcy Code but, rather, with reference to section 365(d)(3) of the Bankruptcy Code, which requires the timely performance of a lease of real property that has not yet been assumed or rejected, and section 362(d)(1) of the Bankruptcy Code, requiring relief from the automatic stay for cause.

judgment relief under 28 U.S.C. § 2201 and Bankruptcy Rule 7001(9).

### Standard on Motion for Summary Judgment

Under Fed.R.Civ.P. 56(c), which is made applicable to this proceeding by Bankruptcy Rule 7056, summary judgment must be entered when "there is no genuine issue of any material fact and ... the moving party is entitled to judgment as a matter of law." Summary judgment should be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact exists, "the Court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). However, the party opposing summary judgment must do more than show "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Summary judgment is particularly appropriate if, as here, the issue depends on the unambiguous terms of written agreements. *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 73 (2d Cir.1989); *DBL Liquidating Trust v. Clarkson Constr. Co. (In re Drexel Burnham Lambert Group, Inc.),* 157 B.R. 539, 543 (S.D.N.Y.1993). When a contract governs an issue, "summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity." *Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992).

Contract terms are unambiguous "when they have a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *LTV Corp. v. AM Gen. Corp. (In re Chateaugay Corp.),* 154 B.R. 843, 847 (Bankr.S.D.N.Y.1993) (internal quotations and citations omitted). "Unambiguous contract language is not made ambiguous simply because the parties urge different interpretations. Nor does ambiguity exist where one party's view strains the contract language beyond its reasonable and ordinary meaning." *Id.* (internal quotations and citations omitted.). Although at times Authentic has addressed the parties' intent, especially in connection with the Hudson Settlement Agreement, Authentic and the other parties have properly kept their focus on the parties' intent as expressed in the actual language of the Sublease, the Overlease and the Hudson Settlement Agreement, because the Court may not consider extrinsic evidence of the parties' intent if the relevant contract language is unambiguous. *Seiden,* 959 F.2d at 428.

### Discussion

**A.** *Authentic's Rights under the Hudson Settlement Agreement.* Paragraph 4 of the Hudson Settlement Agreement describes the circumstances under which Authentic shall be paid, and in some cases keep, up to $100,000:

The Trustees will pay or cause to be paid to Authentic the sum of $100,000 as follows:

(a) $75,000 upon the Effective Date, payable solely from the down payments to be delivered to and held by the escrow agents under the terms and conditions of the Agreements or the Sale Agreements, for Authentic's use *first to cure all arrears and defaults on the*

*[Overlease] in order to permit the Trustee to assume [the Overlease], and next to build livery stables at the [Building]* within 60 days, and

(b) $25,000 *to be paid at the closing of the Agreements or the Sale Agreements, provided* that in the event that Authentic fails to vacate the Aristocratic Property within the 60–day time frame required in sub-paragraph (a) above, Authentic shall not be entitled to any portion of the $25,000 payment. Notwithstanding its failure to meet the 60 day time frame and the forfeiture of the $25,000 payment, Authentic's obligations to vacate the Aristocratic Property, waive its rights arising under or in connection with the Aristocratic Property, the Authentic Lease or Bankruptcy Code § 365(h), and to withdraw the Authentic Claim will remain as continuing obligations, in full force and effect, enforceable in accordance with the terms of this Agreement.

(Emphasis added.)

The Hudson Settlement Agreement defines the "Agreements" referred to in paragraph 4, above, as the sale agreements with the Trustees' stalking horse buyers, Specialty Malls of Tampa, Inc. and Pier West LLC, which they entered into in anticipation of and subject to the auction conducted on January 25, 2002. Hudson Settlement Agreement ¶ K. The Hudson Settlement Agreement defines the "Sale Agreements" referred to in paragraph 4 as the "Agreements, or such other agree-

ments that may be approved as higher or better" by the Court. *Id.* ¶ 1. The definition is found in the Hudson Settlement Agreement's definition of the "Effective Date" of the settlement:

This Agreement is subject in all respects to, and will be effective upon the last to occur of (a) the Court's entry of (i) an order approving this Agreement ("Approval Order") and (ii) an order ("Sale Order") approving the Agreements, or such other agreements that may be approved as higher or better ("Sale Agreements") ("Effective Date").

■ 1. *Authentic's Right to $25,000.* It is clear from the foregoing definitions, therefore, that the condition for the Trustees' payment of $25,000 to Authentic under paragraph 4(b) of the Hudson Settlement Agreement never occurred. Neither the "Agreements" nor the "Sale Agreements" closed. Neither the stalking horse transaction with Specialty Malls and Pier West nor the Pacific Circle transaction nor the transaction with the second highest bidder at the January 25, 2002 auction that was approved in the February 5 Order closed. Instead, the Trustees eventually had to obtain Court approval of a new auction that was held approximately nine months later, on September 18, 2002, and the winning bidder at that auction paid a substantially lower price than either Pacific Circle or the back-up bidder at the January 25, 2002 auction had agreed to pay, and, therefore, was not "higher or better" as required by paragraph 4(a).[5]

---

**5.** Given the foregoing, it is unnecessary to determine whether the other condition to Authentic's right to receive the $25,000 failed. The parties dispute whether Authentic vacated the Aristocratic Premises within the time specified by paragraph 4(b) of the Hudson Settlement Agreement, an issue that is somewhat complicated because (a) the Aristocratic Trustee permitted Authentic to remain at those Premises after the closing of the Pacific

Circle transaction was delayed and then cancelled, yet he reserved his rights with respect to Authentic's breach of paragraph 4(b) for having failed to leave the Aristocratic Premises before such date, (b) Authentic contends it timely vacated the Premises by posting a notice to that effect, (c) orders were thereafter issued requiring Authentic to vacate the Premises by a date certain, and (d) Authentic

■ 2. *Authentic's Right to $75,000.* It also is clear from paragraph 4(a) of the Hudson Settlement Agreement that Authentic's right to retain any part of the $75,000 provided for therein (which under paragraph 4(a) it could use only for building livery stables, not to pay rent under the Sublease) arose *only* if that sum was not first required to cure defaults and arrears under the Overlease in order to permit the Fayolle Trustee to assume the Overlease under section 365 of the Bankruptcy Code. As stated in Paragraph K(v) of the February 5 Order, those cure amounts would not be exactly known until the date of the closing under the Pacific Circle transaction. However, also as made clear in Paragraph K(v) of the February 5 Order, even as of January 31, 2002 those cure amounts substantially exceeded $75,000. Indeed, at all relevant times the cure amounts under the Overlease substantially exceeded $75,000. Therefore, under the Hudson Settlement Agreement Authentic could not have spent any portion of the $75,000 on building livery stables until after the closing of the assignment of the Overlease, and could not have reasonably expected that any portion of the $75,000 would not have been consumed in satisfying cure obligations under the Overlease.

It is true that, contrary to paragraph 4(a) of the Hudson Settlement Agreement, Authentic never was provided with the $75,000 on the "Effective Date" of the Hudson Settlement Agreement, February 5, 2002, to hold for application under paragraph 4(a).[6] However, in light of the size of the cure amounts under the Overlease, Authentic would have held such money only as a mere conduit. It would not have had the right to apply any portion of such funds, if it had been paid them, to build livery stables. Clearly Authentic would have breached the Hudson Settlement Agreement if it had applied such money to Authentic's rent obligations under the Sublease, which was not contemplated under paragraph 4(a) even if the Overlease cure amounts were, for some reason, less than $75,000.[7] Therefore, the Trustees' failure to provide Authentic with the $75,000 for application under paragraph 4(a) was an immaterial breach of the Hudson Settlement Agreement. Judge Bohanon's August 28, 2002 bench ruling directing the Fayolle Trustee to pay cure amounts (which exceeded $75,000) to Anchor from Pacific Circle's forfeited security deposit tacitly recognized that point. As noted above, Fayolle's counsel actively supported this result at the August 28, 2002 hearing.

The Fayolle Trustee now having paid the cure amounts in respect of the Overlease in a sum well in excess of $75,000, Authentic cannot claim any portion of such $75,000 under paragraph 4(a) of the Hudson Settlement Agreement.

B. *Termination of the Sublease.* Paragraph 5 of the Sublease states that "It is the intention of the parties that this Sub-

---

nevertheless has remained at the Aristocratic Premises at the sufferance of the owner.

6. Paragraph 25(a) of the February 5 Order provides that the "Trustees may withdraw from escrow and pay to Authentic $75,000 (the 'Post–Petition Indebtedness') from the Down Payment in accordance with the terms and conditions of the [Hudson] Settlement Agreement." Under paragraph 25(b) of the February 5 Order, this loan from Pacific Circle's security deposit was given superpriority status under section 364(c) of the Bankruptcy Code, to be repaid, presumably, from the proceeds of the Pacific Circle transaction. The Trustees never borrowed from the security deposit, however, to pay Authentic for application under paragraph 4(a) of the Hudson River Settlement Agreement.

7. Authentic, moreover, had breached its obligation under paragraph 5 of the Hudson Settlement Agreement to pay $20,000 toward postpetition arrears under the Overlease.

lease shall be absolutely 'net' to the Sublessee...." As stated in paragraph 5, "except for payments of rent from Sublessor to Overlessor and any other obligation of Sublessor expressly set forth herein, Sublessor shall have no obligations of payment or performance under the Overlease, all of the same to be undertaken and paid or performed by Sublessee." Moreover, "in no event shall Sublessor be obligated to make any rent or other payment to Overlessor unless and until Sublessor has received the corresponding payment from Sublessee." *Id.*

Consistent with the foregoing, paragraph 2 of the Sublease specifically incorporates the Overlease and makes it a part of the Sublease. Paragraph 6 of the Sublease provides, further, that Authentic has assumed the terms, covenants and conditions imposed on the Fayolle Trustee under the Overlease, for purposes of Authentic's obligations to the Fayolle Trustee under the Sublease:

> For purposes of this Sublease, to the extent that the terms, covenants and conditions of the Overlease are not herein modified, cancelled or amended, such terms, covenants and conditions on the part of Sublessor thereunder to be performed, observed or complied with are hereby incorporated herein and made a part hereof with the same force and effect as though set forth at length herein. The said obligations created by the Overlease and incorporated herein by reference, imposed upon Sublessor, are hereby impressed upon Sublessee.[8]

See also Sublease ¶ 17:

> This Sublease is and shall be in all respects subject and subordinate to the terms, covenants, conditions and prohibi-

tions set forth in the Overlease.... In the event of any conflict between the Sublease and the Overlease, the Overlease shall control.

The Sublease does not have a default or termination provision that modifies the default and termination provisions of the Overlease; under the foregoing provisions of the Sublease, therefore, the Fayolle Trustee's right to terminate the Sublease is governed by the Overlease. If the tenant defaults in the payment of rent, under paragraph 17(2) of the Overlease the landlord may, without any notice whatsoever, re-enter the premises, dispossess the tenant, and hold the premises as if the lease had not been made:

> [I]f Tenant shall make default in the payment of the rent reserved herein or any item of additional rent herein mentioned or any part of either or in making any other payment herein required: then and in any such events Owner may without notice, re-enter the demised premises either by force or otherwise, and dispossess Tenant by summary proceedings or otherwise, and the legal representative of Tenant or other occupant of demised premises and remove their effects and hold the premises as if this lease had not been made, and Tenant hereby waives the service of notice of intention to re-enter or to institute legal proceedings to that end.

Because Authentic defaulted in the payment of rent under the Sublease (not paying any monthly rent, among other amounts), the Fayolle Trustee therefore had the right, under paragraph 17(2) of the Overlease as incorporated in the Sublease,

---

**8.** The Sublease created no privity of contract between Authentic and Anchor. 1 Dolan, *Rasch's Landlord & Tenant* § 9:53 (4th ed.2002), at 385. "Therefore, the subtenant's liability is only to his sublessor, and on all the covenants contained in the sublease." *Id.* § 9.54 at 386.

to terminate the Sublease, which he did under the Termination Letter.

Authentic makes several arguments that the Termination Letter nevertheless was ineffective, but each of them fails.

First, Authentic states that the Fayolle Trustee did not comply with the termination procedure required by the Overlease. Authentic relies, however, on the wrong provision of the Overlease: paragraph 17(1), which expressly does not apply to defaults in the payment of rent, rather than paragraph 17(2) of the Overlease, which does.

Second, Authentic contends that the Trustees' default under the Hudson Settlement Agreement and the February 5 Order approving that agreement excuses Authentic's nonpayment of rent. However (and leaving aside that paragraph 5.a. of the Sublease states that Authentic's obligation to pay rent is absolute, "with no abatement, deduction, counterclaim or set-off whatsoever") the Trustees have not materially defaulted under the Hudson Settlement Agreement or the February 5 Order, as discussed above. Authentic has no claim to any portion of the $100,000 that, under certain conditions specified in the Hudson Settlement Agreement, Authentic had the right to retain for its own use, those conditions not having occurred. Moreover, the Fayolle Trustee's termination of the Sublease was not premature; if the $75,000 had been applied to cure defaults under the Overlease at the time he sent the Termination Letter, Authentic still would have had a large unpaid rent obligation, because those cure payments substantially exceeded $75,000.

■ Third, the Fayolle Trustee has not waived the Termination Letter by agreeing to disagree with Authentic's position that the Sublease was improperly terminated or by participating in this adversary proceeding, as Authentic somewhat re-markably contends. To the contrary, the Fayolle Trustee has consistently defended the validity of his termination of the Sublease. Authentic, instead, took the risk that the termination of the Sublease would become effective pending the determination of the issues in this proceeding if it did not seek injunctive relief or resume performance of the Sublease. *Cf.* 2 Dolan, *Rasch's Landlord & Tenant* § 23:53 (4th ed.2002), at 215–16:

> Without the [*Yellowstone*] injunction, the court is powerless to revive or extend the lease which will have expired and terminated by virtue of tenant's breach of a conditional limitation without cure, within the time fixed in the landlord's notice.

■ In addressing Authentic's fourth and fifth arguments—that the Termination Letter was technically deficient and improperly vague—it should be kept in mind that the Fayolle Trustee has not sought the Court's assistance to obtain possession of the Building from Authentic. At least since the roof collapsed on August 29, 2002, if not before, Authentic has not been in possession of the Building. Therefore, the detailed and somewhat onerous statutory notice requirements for purposes of a summary proceeding under N.Y. RPAPL § 711 based on the nonpayment of rent do not apply here. *See Ferry Bldg. Co. v. 44 Wall Street Fund, Inc.,* 142 Misc.2d 54, 57, 535 N.Y.S.2d 685, 687 (N.Y. Civ.1988):

> In the final analysis, what is conclusive to the determination of the jurisdictional question [of whether the tenant is in possession and RPAPL § 711 applies] is whether the petitioner can take complete possession of the premises without need of a summary proceeding. [Citation omitted.] The test is whether a Marshal or other officer of the court would give the landlord nothing under

the final order because the premises are wholly vacant and the landlord has the keys.

Instead, this is a proceeding simply to determine whether the Sublease continues to exist or whether the Fayolle Trustee has properly exercised a right reserved in the Sublease to terminate it. *See, e.g., 110–45 Queens Blvd. Garage, Inc. v. Park Briar Owners, Inc.,* 265 A.D.2d 415, 696 N.Y.S.2d 490, 491 (2d Dep't 1999) ("The law permits a commercial landlord to reserve th[e] right" to peaceably "re-enter the commercial premises in issue upon termination of the lease or default in the payment of rent."); *see also Bozewicz v. Nash Metalware Co.,* 284 A.D.2d 288, 725 N.Y.S.2d 671 (2d Dep't 2001); *Jovana Spaghetti House, Inc. v. Heritage Co. of Massena,* 189 A.D.2d 1041, 1042, 592 N.Y.S.2d 879 (3d Dep't 1993); 2 Dolan, *Rasch's Landlord & Tenant* § 23:38, at 201–02.

In section 17(2) of the Overlease, Authentic waived notice of termination for failure to pay rent, but even if such a waiver were unenforceable, the Termination Letter properly put Authentic on notice of its intention to terminate the Sublease for failure to pay rent. 2 Dolan, *Rasch's Landlord & Tenant* § 23:38 at 201:

Basically, an option to terminate a lease can be exercised only by complying with the provision granting it. A notice of termination must be clear, unambiguous, and unequivocal notice of limitation; it must clearly and by its terms provide for the automatic expiration of the leasehold, and convey this fact to the other party.

*See also City of Buffalo Urban Renewal Agency v. Lane Bryant Queens, Inc.,* 90 A.D.2d 976, 456 N.Y.S.2d 568 (4th Dep't 1982), *aff'd* 59 N.Y.2d 825, 464 N.Y.S.2d 754, 451 N.E.2d 501 (1983). The Termi-

nation Notice clearly served its intended function. It gave Authentic the effective date and time of termination. It stated why the Sublease was being terminated. And it was consistent with the Fayolle Trustee's right under paragraph 17(2) of the Overlease, as incorporated in the Sublease, to terminate the Sublease for nonpayment of rent. The Fayolle Trustee did not have to specify the amount of rent that Authentic had not paid, as Authentic contends; it was sufficient to put Authentic on notice that the Trustee was terminating the Sublease because Authentic had failed to pay rent under paragraph 5 of the Sublease, a default that continues to this day, a year later, Authentic not having paid *any* monthly rent. Nor did the Fayolle Trustee have the obligation under the Sublease to provide Authentic with the right to cure the rent defaults, as Authentic argues; indeed, if the Trustee had offered a cure option to Authentic, the Termination Notice might not have been effective. *See* 2 Dolan, *Rasch's Landlord & Tenant* § 23:38, at 201 (notice to cure a default cannot be deemed a termination notice).

Authentic's last argument—that Anchor's refusal to consent to the alterations to the Building proposed by Authentic and its designee excuses Authentic's failure to pay rent-also is unavailing. To resolve this issue it is not necessary to decide whether Anchor has improperly withheld consent. Even if Anchor improperly withheld consent, Authentic, as subtenant, was not in privity with Anchor, as overlandlord; Authentic, therefore, had no claim against Anchor. *Full House Foods, Inc. v. 33 Street Enters. (In re Full House Foods, Inc.),* 279 B.R. 71, 76–7 (Bankr. S.D.N.Y.2002); 1 Dolan, *Rasch Landlord & Tenant* § 9.53, at 385. Further, the Sublease has no provision excusing Authentic's performance if Anchor breached

such a provision of the Overlease. Indeed, paragraph 11 the Sublease provides, to the contrary, that Authentic shall make no alterations or improvements to the Building without any required consent by Anchor.[9] Thus, while Anchor had not duty to Authentic, Authentic had a duty to the Fayolle Trustee to obtain Anchor's consent.

Moreover, paragraph 7 of the Sublease contains the following exculpation of the Fayolle Trustee in the event of Anchor's breach of the Overlease:

> Under no circumstances whatsoever shall Sublessor be liable to Sublessee for any failure of Overlessor to provide any service or otherwise perform, observe or comply with Overlessor's obligations under the Overlease, but Sublessor agrees to use reasonable efforts to cause Overlessor to comply with the Overlease.[10]

Construing similar exculpatory language, *Full House Foods* held that the overlandlord's breach of the overlease would not excuse the subtenant's rent default under the sublease. 279 B.R. at 77–8. Therefore, even if Anchor improperly withheld its consent to the proposed alterations to the Building, an issue not here determined, Authentic would not have been excused thereby from performing its obligations under the Sublease.

### Conclusion

Authentic's motion for summary judgment is DENIED, and defendants' request for summary judgment is GRANTED, as set forth herein.

It is SO ORDERED.

---

9. Authentic has pointed to paragraph 16 of the Sublease, which provides that "Sublessee shall, without the necessity of obtaining Sublessor's consent, have the right to license or otherwise contract for or agree to allow occupancy of portions of the [Building] for the boarding or stabling of carriage horses and storing or garaging of equipment," to contend that Anchor's withholding of consent clearly was wrongful. However, this provision applies only to the Fayolle Trustee and, moreover, does not deal with alterations to the Building, which are specifically addressed by paragraph 11 of the Sublease.

10. There has been no contention that the Fayolle Trustee failed to use reasonable efforts to cause Anchor to comply with the Overlease.